PAYNE *v.* STATE.

4953                                    332 S. W. 2d 233

Opinion delivered February 22, 1960.

*Wiley A. Branton,* for appellant.

*Bruce Bennett,* Attorney General, By: *Thorp Thomas,* Asst. Attorney General, for appellee.

J. SEABORN HOLT, Associate Justice.   On a charge of murder in the first degree, appellant, Frank Andrew Payne, was, on January 11, 1956, tried, found guilty as charged and his punishment fixed by the jury at death by electrocution.   We affirmed, *Payne v. State,* 226 Ark. 910, 295 S. W. 2d 312.   On appeal to the Supreme Court of the United States, the judgment was reversed for error in introducing in evidence a coerced confession of appellant, *Payne v. Arkansas,* 356 U. S. 560, 2 L. Ed. (2d) 975, 78 S. Ct. 844.   Thereafter, in April 1959, appellant was again tried and a jury again found him guilty of murder in the first degree and fixed his punishment at death in the electric chair.   The present appeal followed.

For reversal, appellant assigns eight alleged errors. After reviewing them all, we find merit in but one of appellant's assignments and that is number five which

is: "That the Court erred in admitting into evidence the actions of the appellant in connection with an alleged re-enactment of the crime immediately following the giving of an involuntary confession."

Appellant, a Negro 19 years of age, brutally murdered his employer on the night of October 4, 1955 in the office of his victim's lumber yard in Pine Bluff, Arkansas. (Reference is made to the first appeal for a more complete statement of the facts.) Appellant's first confession, as indicated, was held to be coerced by the Supreme Court of the United States on the undisputed facts which are recited in that opinion as follows: "The undisputed evidence in this case shows that petitioner, a mentally dull 19-year-old youth, (1) was arrested without a warrant, (2) was denied a hearing before a magistrate at which he would have been advised of his right to remain silent and of his right to counsel, as required by Arkansas statutes, (3) was not advised of his right to remain silent or of his right to counsel, (4) was held incommunicado for three days, without counsel, advisor or friend, and though members of his family tried to see him they were turned away, and he was refused permission to make even one telephone call, (5) was denied food for long periods, and, finally, (6) was told by the chief of police 'that there would be 30 or 40 people there in a few minutes that wanted to get him,' which statement created such fear in the petitioner as immediately produced the 'confession'. It seems obvious from the *totality* of this course of conduct, and particularly the culminating threat of mob violence, that the confession was coerced and did not constitute an 'expression of free choice', and that its use before the jury, over petitioner's objection, deprived him of 'that fundamental fairness essential to the very concept of justice,' and, hence, denied him due process of law, guaranteed by the Fourteenth Amendment."

The facts in the present case show that appellant, after he made and signed the above confession at about three o'clock in the afternoon in the presence of the chief of police, police officers and others, including a newspaper reporter, was later on the same afternoon, at

about five o'clock, removed in the car of the chief of police to the scene of the crime and in the presence of the same officers and others who had witnessed his confession, and without being allowed to consult counsel or anyone, was directed to re-enact the crime which he proceeded to do. In re-enacting the crime, he went through actions essentially and, in effect, what he had said in the confession less than two hours before. He demonstrated where he had picked up an iron bar from behind the door, how he had walked over to the desk where his employer was and struck him, then going behind the counter and striking decedent several more times, finally taking the wallet from decedent's body, some money from the cash drawer, and then fleeing.

It seems to us, and we hold, that this re-enactment amounted to but a part of his coerced confession, and was also coerced and unlawfully obtained. Our rule in this state on the admissibility of confessions was announced in the early case of *Love* v. *The State,* 22 Ark. 336, where we held: "Confessions are not admissible against a party charged with crime, unless freely and voluntarily made, and the onus is upon the State to prove them of this character. When the original confession has been made under illegal influence, such influence will be presumed to continue and color all subsequent confessions, unless the contrary is clearly shown", and in 50 Ark. 305, 7 S. W. 255, *Corley* v. *State,* we said: "The rule is established in this state, in accord with the unvarying current of authority elsewhere, that a confession of guilt, to be admissible, must be free from the taint of official inducement, proceeding either 'from the flattery of hope or the torture of fear' ", citing *Bullen* v. *State,* 156 Ark. 148, 245 S. W. 493. We also held in *Turner* v. *State,* 109 Ark. 332, 158 S. W. 1072: "Where improper influences have been exerted to obtain a confession from one accused of a crime, the presumption arises that a subsequent confession of the same crime flows from that improper influence; but such presumption may be overcome by positive evidence that the subsequent confession was given free from undue influence."

The general rule regarding the admissibility of a subsequent confession following an involuntary and coerced confession is stated in 20 Am. Jur., Evidence § 487, in this language: "If one confession is obtained by such methods as to make it involuntary, all subsequent confessions made while the accused is under the operation of the same influences are also involuntary. It is immaterial, in this connection, what length of time may have elapsed between the two confessions, if there has been no change in the circumstances or situation of the prisoner. Once a confession made under improper influences is obtained, the presumption arises that a subsequent confession of the same crime flows from the same influences, even though made to a different person than the one to whom the first was made. However, a confession otherwise voluntary is not affected by the fact that a previous one was obtained by improper influences if it is shown that these influences are not operating when the later confession is made. * * * The evidence to rebut the presumption that the subsequent confession, like the original confession, is involuntary must be presented by the prosecution and must be given at the time the subsequent confession is offered in evidence, provided the court is then cognizant that the accused has made a prior involuntary confession. The evidence to rebut the presumption must be clear and convincing, however."

A review of this record convinces us that the fear and coercion that tainted the first confession were present in the re-enactment which, as indicated, we characterize and hold to be, in effect, a second coerced confession and hence evidence adduced at the re-enactment is also inadmissible and prejudicial to appellant.

Accordingly, the judgment is reversed and the cause remanded.

ROBINSON, J., concurs.

HARRIS, C. J., McFADDIN and WARD, JJ., dissent.

SAM ROBINSON, Associate Justice, concurring. I concur for the purpose of pointing out that this Court does

not of its own volition find that the confession made by the appellant was involuntary. In fact, we have specifically held that the confession was voluntary; *Payne* v. *State*, 226 Ark. 910; but the Supreme Court of the United States overruled this Court on that point. *Payne* v. *Arkansas*, 356 U. S. 560, 2 Law Ed. 2d, 78 Sup. Ct. 844.

The United States Supreme Court decision that the confession was involuntary is the law of the case. Since it has been thusly decided that the confession was not voluntary, it must be considered as involuntary by this Court in reaching a conclusion as to whether the re-enactment of the crime by the defendant was, therefore, also involuntary. As pointed out in the majority opinion, the re-enactment was so closely connected with the confession as to form a part of the same transaction and is, therefore, inadmissible.

CARLETON HARRIS, Chief Justice, dissenting. The only question, as I view it, is whether the re-enactment of the crime by Payne was voluntarily done, or under duress and compulsion. The first Payne case was reversed by the United States Supreme Court under the holding that a confession of the defendant, admitted into evidence, was obtained by coercion. At no place in that Opinion is mentioned the re-enactment of the crime. I do not agree that Payne was acting under the operation of the same influences present when the confession was made. Evidence was offered in the first case that at the time the confession was made, Payne was told that thirty or forty people were outside the jail wanting in to get the defendant. According to Payne, the Chief of Police had told him "if I wanted to make a confession, he would try to keep them out." No such threat occurred during the re-enactment, which took place at the building where Robertson was killed, a considerable distance from the jail. The testimony reflects that appellant's actions on the premises were entirely voluntary, and that he demonstrated the manner in which the crime was committed without "prodding" or suggestions from the police. For instance, relative to the murder weapon, a piece of iron, Payne, in relating from the witness stand his actions at the lumber company building, stated:

"Q. Where did you go first when you came in the rear of the building, where did you stop, did you stop?

A. We stopped at the door if I am not mistaken.

Q. How far down from Mr. Robertson's desk?

A. I wouldn't know to be exact.

Q. Is it further than an arm's reach away from the desk where you stopped?

A. Yes, sir, it is.

Q. Did you indicate at that point anything?

A. Yes, sir.

Q. What did you indicate there?

A. At the door?

Q. That is at the door.

A. I indicated that I picked up an iron, I was picking up something there.

Q. You picked up something there - you said an iron what?

A. I said I was indicating where I picked up something.

Q. You indicated you picked up something — who lead you to that spot, Frank?

A. Who lead me to that spot?

Q. That's right — who told you that was the spot where you picked up something?

A. *No one.* (my emphasis)

Q. No one did that, but you stopped at that point, didn't you?

A. I did.

Q. And you indicated that you picked up something there. Then where did you go next?

A. To Mr. Robertson's desk.''

He subsequently pointed out the place where he had thrown the weapon, which, according to the evidence, was within inches of the spot where it was found by a radio newsman. Appellant does not claim that he was forced to re-enact the crime, or that anybody told him what actions to perform. There is no claim that he was threatened or abused. Certainly, he had no reason to fear mob action at the time. The most that he said was that he was "scared." This certainly was not unusual, for most anyone who is arrested has a feeling of fear, and this is probably even true where people are stopped by officers and given traffic tickets. The point is that the officers did nothing to cause that fear. As stated, the sole question is whether this re-enactment was voluntary and free from any improper influence, and not traceable to any prohibited influence previously exerted either by promise made by way of previous inducement, or by threats or violence. *Smith* v. *State*, 74 Ark. 397. The sheriff and police officers all testified that Payne received no promises, nor was he mistreated in any way in order to obtain the re-enactment, and Bill Miles, city editor of the Pine Bluff Commercial, testified that following the re-enactment, he walked over to Payne and asked if he had been mistreated in any way, and that the defendant replied that he had not.

I am fully cognizant of the rights given a defendant under our Constitution, and I am entirely persuaded that Payne received every safeguard afforded by these guarantees. At the trial itself, the jury was instructed, *at the request of defendant,* as follows:

"Before any statements or acts made by the defendant to the officers or other persons can be considered by you as evidence in the case you must believe from the testimony that such statements or acts were freely and voluntarily made and done without any threat or fear of punishment and without any promise or hope of reward. If you believe from the evidence in this case that any statements or acts that were made or done by the defendant were freely and voluntarily made by him you should consider such statements and acts along with all the testimony in the case in

determining the guilt or innocence of the defendant. If you believe that said statements and acts were not free and voluntary, that they were induced by fear of punishment or promise of reward, you should not consider such statements and acts for any purpose whatsoever.''

Certainly it is proper to assume that jurors consider all of the instructions given by the court. The jury (which incidentally, included two members of appellant's race), by its verdict, if it considered the evidence of re-enactment at all, apparently found that these acts of the defendant were not coerced, and there being no evidence to the contrary, the jury's verdict should be allowed to stand.

I strongly feel that the judgment should be affirmed.

Justices McFADDIN and WARD join in this dissent.